**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DIKA-HOMEWOOD, L.L.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 786** |
| | ) | |
| **OFFICEMAX, INC. n/k/a** | ) | |
| **OfficeMax North America, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge.

Dika-Homewood, LLC sued OfficeMax, Inc. for breach of contract and fraud arising from a seventeen-year commercial lease agreement. OfficeMax counterclaimed, alleging breach of contract and unjust enrichment. The parties have filed cross motions for summary judgment on Dika's claims. For the reasons stated below, the Court grants OfficeMax's motion and denies Dika's.

**Background**

The following facts are undisputed unless otherwise noted. On December 20, 1999, Dika and OfficeMax entered into a written lease agreement under which OfficeMax leased a shopping center space owned by Dika in Homewood, Illinois, for a term of fifteen years. The lease was set to expire on January 31, 2016. On March 23, 2015, the parties executed a second amendment under which the lease term was extended for five years to January 31, 2021. Among other things, the lease required OfficeMax to pay rent, a pro-rata share of common area maintenance (CAM) expenses

each month, and annual real estate taxes.

In October 2016, OfficeMax installed six new HVAC units on the property. OfficeMax has offered evidence, which Dika disputes, that it paid $96,758.49 to replace the property's HVAC system and that the replacement was necessitated by the age of, and performance issues with, the existing system.

In 2019, OfficeMax replaced the property's existing fluorescent lighting with light-emitting diode (LED) lighting. OfficeMax has offered evidence, which Dika disputes, that installing the new LED tubes required rewiring and/or replacing parts of the existing light fixtures and sockets. Dika also disputes the evidence offered by OfficeMax to substantiate the $14,106.43 it contends it spent on the lighting installation.

On November 13, 2019, OfficeMax's lease administrator, Melvin Cortes, sent Dika's property manager for the Homewood property, Richard Robey, a request for reimbursement for the expenses related to the LED lighting and HVAC installations. Cortes attached invoices to the request. Dika disputes that this letter constitutes a proper request for reimbursement. In this regard, Dika contends that (1) one of its attorneys, Marshall Dickler, was not copied on the correspondence; (2) the letter was not sent "in the form and manner required, as the document was not sent as required by the Lease" (what Dika means by this is unclear); and (3) the invoices did not provide reasonable evidence of OfficeMax expenses or that they qualified for reimbursement under the tenant allowance provision of the second amendment to the lease (section 5).

During his deposition, Robey testified that, upon reviewing OfficeMax's request, he believed OfficeMax had met the requirements for reimbursement. Robey further testified that on January 9, 2020, in response to an e-mail from Cortes following up on

his November request, he told Cortes that "[he] thought [the reimbursement] had been processed" and that he would "check on status [sic]" and "make certain [he] ha[d] the funding and [that] the payment is issued." Robey Dep. at 40:15–41:3 (quoting Def.'s LR 56.1 SOF, Ex. 10). Robey testified during his deposition that he e-mailed Cortes informing him that the $75,000 tenant allowance reimbursement should be paid on January 15, 2020 because, after his review of the property's bank account, he believed the funding was in place. On April 24, 2020, however, Robey informed Cortes that OfficeMax's request for reimbursement under the tenant allowance provision was denied.

On June 18, 2020, OfficeMax sent Dika a notice of default stating that Dika was in violation of the lease for its failure to reimburse OfficeMax for the LED lighting and HVAC replacement under the tenant allowance provision. On June 26, 2020, Dika served a notice of default on OfficeMax. On July 24 and 31, 2020, Dika sent further letters to the assistant general counsel of OfficeMax via certified mail about the alleged default. In these letters, Dika disputes a number of the points made by OfficeMax in its notice of default, but the only obligation on which Dika actually states OfficeMax defaulted was its duty to seek approval for the work prior to having it done under section 15 of the lease. Dika also stated what its position would be if OfficeMax were to commit another breach by deciding to withhold rent. On October 1, 2020, OfficeMax sent a response to the letters, to which Dika responded in turn on October 2, 2020.

After Dika refused to reimburse OfficeMax for the LED lighting or HVAC replacement, OfficeMax withheld the monthly annual minimum rent of $18,114.58 for the final four months of its lease—from October 2020 through January 2021—for a total

3

withholding of $72,458.32.  Dika disputes the contention that OfficeMax was within its right to withhold rent to cover its losses after being denied the tenant allowance.

On December 31, 2020, Dika filed suit against OfficeMax in the Circuit Court of Cook County.  On February 11, 2021, OfficeMax removed the case to this Court based on diversity of citizenship.

In its second amended complaint—which is the operative complaint in this case—Dika asserts two claims.  In count 1, Dika alleges that OfficeMax breached various provisions of the lease by failing to pay rent from October 1, 2020 through December 2, 2020, CAM expenses, and real estate taxes for 2020 and January 2021. In count 2, Dika alleges that OfficeMax fraudulently withheld rent after it was rightfully denied reimbursement for its replacement of the HVAC system and lighting system. OfficeMax originally asserted a four-count counterclaim which, following the Court's August 17, 2021 Order on Dika's motion to dismiss, has since been amended to a three-count counterclaim.  In count 1, OfficeMax alleges that Dika breached section 14 of the lease due to its failure to reimburse OfficeMax for replacement of the HVAC system.  In count 2, OfficeMax alleges that Dika breached section 5 of the second amendment to the lease by failing to reimburse OfficeMax for both the LED lighting and HVAC replacements.  In count 3, OfficeMax seeks to recover for these same expenses under the doctrine of unjust enrichment.  Discovery is now complete, and both parties have moved for summary judgment.

In the opening paragraph of Dika's response and cross motion for summary judgment, it states that it "moves for Summary Judgement [sic] on its Amended Complaint Count 1 for Breach of Contract."  Pl.'s Resp. at 1.  The "prayer for relief"

section of Dika's response, however, asks the Court to enter an order:

> a) denying OfficeMax's Motion for Summary Judgment;
> b) granting Dika-Homewood's Motion for Summary Judgment;
> c) entering judgment in Dika-Homewood's favor and against OfficeMax on its Amended Complaint;
> d) entering judgment in favor of Dika-Homewood for the rent withheld by OM in the amount of $72,458.32;
> e) entering judgment in favor Dika-Homewood for the cost to remove and replace the flooring, drywall and electronics as set forth in the Exhibits;
> f) entering judgment in favor of Dika-Homewood for the real estate taxes for January, 2021;
> g) entering judgment in favor of Dika-Homewood for its reasonable attorney fees and costs;
> h) plus any further relief in favor of Dika-Homewood as this Honorable Court deems just and proper.

*Id*. at 14.

If one reads the opening paragraph together with the prayer for relief, Dika's response and cross motion is best read as seeking summary judgment on *both* of its claims. But if Dika's prayer for relief was an attempt to transform its motion into a motion for summary judgment on OfficeMax's counterclaims, the Court overrules it. It is true that OfficeMax's counterclaims are, in many ways, the converse of Dika's claims. But neither party formally moved for summary judgment on those counterclaims. The Court notes that Dika did briefly discuss OfficeMax's unjust enrichment counterclaim in the body of its motion, but did not specify that, in doing so, it was moving for summary judgment on that claim. OfficeMax even noted in its reply that Dika's arguments regarding the unjust enrichment counterclaim were "inconsequential" as "OfficeMax's motion seeks to dispose of Dika's claims, not OfficeMax's." Def.'s Reply at 12 n. 5. Because Dika did not clearly state that it was seeking summary judgment on OfficeMax's counterclaims, OfficeMax was deprived of the opportunity to respond to any

such request.  For these reasons, the Court declines to read a request for summary judgment on OfficeMax's counterclaims into Dika's response and cross motion.

## Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018).  The Court views the evidence and draws all reasonable inferences in the nonmoving party's favor. *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).  If the nonmoving party fails to establish the existence of an element essential to its case on which it would bear the burden of proof at trial, summary judgment must be granted to the moving party.  *Id.*

The primary issues on the parties' cross motions for summary judgment involve the interpretation of the terms of their lease, which is a contract governed by Illinois law. Construction of a contract is typically a question of law appropriately decided on summary judgment.  *William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334, 830 N.E.2d 760, 770 (2005).  A court interprets the words of the contract in accordance with their common and generally accepted meanings unless the contract specifies a different meaning. *J.M. Beals Enters., Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748, 551 N.E.2d 340, 342 (1990).  The mere fact that the parties disagree on the meaning of a term does not make that term ambiguous.  *Johnstowne Centre Partnership v. Chin*, 99 Ill. 2d 284, 288, 458 N.E.2d 480, 481 (1983).

## A.    Count 1:  breach of contract

The parties do not dispute that Illinois law governs the lease and its amendments.  To prevail on a breach of contract claim under Illinois law, a party must

prove that a contract existed, it performed all conditions required under the contract, the other party breached the contract, and the party asserting the claim suffered damages as a result of the breach. *Shubert v. Fed. Express Corp.*, 306 Ill. App. 3d 1056, 1059, 715 N.E.2d 659, 661 (1999). The parties do not dispute that a valid contract existed between them, but they do dispute the performance-of-conditions and breach elements.

In count 1 of its second amended complaint, Dika alleges that OfficeMax breached its contractual obligations under the lease to timely pay rent, CAM expenses, and real estate taxes. And during summary judgment briefing, Dika has also peppered in allegations—that it seemingly considers part of its breach of contract claim— regarding OfficeMax's claimed failure to leave the premises in good condition. For the reasons stated below, the Court grants OfficeMax's motion for summary judgment on count 1.

### 1. Nonpayment of rent

It is undisputed that, under the parties' lease agreement, OfficeMax was obligated to pay a monthly annual minimum rent of $18,114.58. It is also undisputed that, for the final four months of its lease, OfficeMax withheld a total of $72,458.32 in rent. The question of breach thus turns on whether, under the terms of the lease, OfficeMax was entitled to withhold rent. The Court concludes that it was.

### a. Dika's nonperformance under section 5

OfficeMax contends that Dika cannot prevail on its breach of contract claim related to OfficeMax's nonpayment of rent because Dika did not perform its obligations under section 5 of the second amendment to the lease. Specifically, OfficeMax contends that Dika was obligated to reimburse it under the tenant allowance provision in

section 5 for the HVAC and lighting work it undertook. This term of the second amendment to the lease states:

> **5.    Tenant Allowance.**  Landlord agrees to pay to Tenant $75,000.00 (**the "Tenant Allowance"**).  The Tenant Allowance shall be due and payable on the date that is thirty (30) days following the date that Tenant provides reasonable evidence to Landlord that Tenant incurred expenses remodeling, redecorating and/or renovating the Premises, the cost of which is equal to or in excess of $75,000.00 (if Tenant spends less than $75,000.00, then the Tenant Allowance shall be reduced to be equal to such smaller figure).  *The Tenant Allowance may be used for any expenses incurred by Tenant in conjunction with Tenant's remodel, redecoration and/or renovation of the Premises, as well as for any furnishings, fixtures and equipment related thereto*.

Def.'s LR 56.1 SOF, Ex. 2, § 5 (italics added).  Section 5 further provides that "If Landlord fails to pay Tenant any portion of the Tenant Allowance when due, Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Annual Minimum Rent."  *Id.*

OfficeMax contends that because Dika denied it the tenant allowance, it was entitled to deduct, from the annual minimum rent, the amount it was owed under the allowance.  Dika contends that the tenant allowance does not apply to OfficeMax's installation of LED lighting or new HVAC units because neither involved "remodeling, redecorating and/or renovating the premises," as required by section 5.

The lease, including the second amendment, does not provide a definition for the terms remodeling, redecorating, or renovating.  The common meaning of "remodel" is to "alter the structure of."  Remodel, Merriam-Webster Dictionary, https://www.merriam webster.com/dictionary/remodel (last visited February 19, 2023).  "Redecorate" means "freshen or change in appearance."  Redecorate, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/redecorate (last visited Mar. 21, 2023).

8

"Renovate" means "restore to a former better state (as by cleaning, repairing, or rebuilding)." Renovate, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/renovate (last visited Mar. 21, 2023). Finally, the common meaning of a "fixture" is

> **a:** something that is fixed or attached (as to a building) as a permanent appendage or as a structural part
> – a plumbing *fixture*
> **b:** a device for supporting work during machining
> **c:** an item of movable property so incorporated into real property that it may be regarded as legally a part of it

Fixture, Merriam-Webster Dictionary, https://www.merriam webster.com/dictionary/fixture (last visited Mar. 21, 2023).

### i.    Lighting

Regarding the lighting project, Dika characterizes the work performed as routine maintenance for which OfficeMax, as the tenant, was responsible. Dika essentially contends that OfficeMax's installation amounted to replacing lightbulbs, which would not be reimbursable under the tenant allowance provision because it does not amount to remodeling, redecorating, or renovating. Dika also seizes upon the fact that OfficeMax simultaneously replaced the lighting at other OfficeMax store locations.[1] OfficeMax contends that it installed the lighting for the purpose of remodeling, redecorating, and/or renovating and that the related expenditures therefore are within the terms of section 5.

OfficeMax offered evidence that the work performed in order to upgrade the lighting on the property extended beyond replacing lightbulbs:

---

[1] The Court acknowledges Dika's evidence that similar work was undertaken simultaneously at other OfficeMax locations. But Dika makes no colorable argument that this has any bearing on whether the work done at the Homewood property was eligible for reimbursement under the lease governing that property.

> A. They changed the fixtures from, I believe it was, metal hay [sic] light to
> LED fixtures, which would require a change in the entire mechanical
> aspect of the light.
> Q. When you say – what do you mean by "requires a change in the entire
> mechanical aspect of the lights"?
> A. I would think they would have to have changed the fixtures because
> LED light takes different ballasting materials to make them operate.
> Q. So you are saying it would have been the light fixtures?
> A. Yes.
> Q. Would it have also been the lights?
> A. Yes.

Robey Dep. 90:7-22.  The undisputed evidence reflects that OfficeMax had to rewire

multiple fixtures and sockets to replace the hundreds of lights in the store, which

resulted in it "look[ing] lighter, brighter, and like restructured where [OfficeMax] had laid

everything out."  *Id*. 96:6-14.  Jorge Rivera, a senior manager in OfficeMax's Facilities

department, and OfficeMax's Rule 30(b)(6) designee, testified during his deposition that

LED lights are more energy efficient because they run a lot cooler than the preexisting

fluorescent lights, which puts less strain on the HVAC system.  This increases the

expected longevity of the updated HVAC system and yields lower energy costs for the

tenant, or if the tenant is not in possession of the property, then the landlord.

Dickler also testified in his capacity as Dika's 30(b)(6) designee about what kinds

of work would qualify for reimbursement as "renovation" under section 5:

> Q. What would constitute the type of action that would qualify for
> renovating the premises under the tenant allowance provision?
> A. Replacement of the floor would be a renovation.
> Q. What else?
> A. Well, I – it's not all-inclusive, but that's the easiest one. *Replacement of
> fixtures, some kinds of fixtures,* depending on what it is.

Dickler Depo. at 108:15-23 (emphasis added).  Dika contends that "It is possible that

the Premises looks brighter with new and clean bulbs" but that "the room look[ing]

brighter does not convert a routine tenant responsibility for maintenance and

replacement to a remodel, redecorate and/or renovate." Pl.'s Resp. at 8. But Dickler testified that "devices that [] modify the appearance" of the premises, which the new LED lights clearly did, would qualify as redecoration--and redecoration expenses are reimbursable under the lease. *Id*. at 107:9-10. Dika argues in its brief that "[r]efresh could mean painting, changing color. Redecoration could mean painting." Pl.'s Resp. at 8. Taking that argument as face value, it is inconsistent with Dika's position here: it makes no sense to say that repainting a wall in a new color as "redecoration" qualifies for reimbursement but to say that replacement of the lighting system—which the undisputed evidence shows changed, and arguably improved, the appearance of the premises—does not qualify.

For these reasons, the Court concludes that the LED lighting upgrade that OfficeMax constitutes remodeling, redecorating, or renovating within the meaning of section 5 of the lease, and that the new lighting fixtures installed were "related thereto." Def.'s 56.1 SOF, Ex. 2, § 5. No reasonable factfinder could find otherwise.

### ii. HVAC

Regarding the HVAC replacement, Dika conflates arguments related to reimbursement under the "repairs and maintenance" provision found at section 14 of the lease (discussed below) and those related to section 5. Dika makes only two contentions regarding OfficeMax's entitlement to reimbursement for the HVAC replacement under the terms of section 5.

First, Dika contends that because the HVAC units were installed on the roof of the building, they were not installed "on the premises" as required by section 5. Def.'s 56.1 SOF, Ex. 1 § 1 ("The Demised Premises shall not include any part of the exterior

11

walls or roof of the building, nor any lands beneath the floor of the Demised Premises."). But the record establishes that the HVAC installation included work that falls within that definition, as Rivera testified during his deposition (and it is undisputed) that much of the HVAC duct work is housed within the confines of the building. Thus, even if the HVAC units on the roof are themselves outside the "Premises," the fact that much of the HVAC system replacement was within the "Premises" renders the HVAC units on the roof "equipment related thereto" and thus covered under section 5.

Second, Dika contends that "When the second sentence [of section 5] with the word Premises is read in conjunction with the first sentence including Premises analyzed above, it is unequivocal that the furnishings, fixtures and equipment related thereto cannot be the sole and only remodeling, redecorating and/or renovating of the Premises." Pl.'s Resp. at 12. As written, it is not entirely clear what Dika is arguing in this sentence. The best the Court can come up with is that Dika is contending that, because the HVAC replacement did not constitute remodeling, redecorating, and/or renovating, the units installed on the roof of the building cannot be considered "equipment related thereto." Dika has arguably forfeited this argument, as it fails to develop it any further and or provide record support for it. *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 ("Seventh Circuit precedent is clear that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks omitted). But even if Dika has not forfeited the point, the undisputed evidence offered by OfficeMax establishes that the HVAC replacement falls within the meaning of "remodeling, redecoration and/or renovation of the Premises" and/or "furnishings, fixtures, and equipment related

thereto."  Def.'s LR 56.1 SOF, Ex. 2, § 5.  OfficeMax offered deposition testimony and documentary evidence that the HVAC system was almost seventeen years old at the time OfficeMax replaced it and was experiencing performance issues.  As OfficeMax contends, "[t]here is no meaningful way to under [section 5] to distinguish reimbursement for redoing a bathroom partition or replacing a toilet – which [Dika] concedes would qualify for reimbursement – with replacement of the property's HVAC system."  Def.'s Mot. for Summ. J. at 7.  Perhaps more importantly, the replacement of the HVAC system and the beneficial results that followed, fall within the dictionary definitions for "remodeling" and/or "renovating."  As indicated earlier, the common meaning of "remodel" is to "alter the structure of," and synonyms include "alter," "change," or "revamp."  Remodel, Merriam-Webster Dictionary, https://www.merriam webster.com/dictionary/remodel (last visited March 21, 2023).  That's quite clearly what the HVAC replacement involved.  Additionally, the common meaning of "renovate" is "restore to a former better state (as by cleaning, repairing, or rebuilding)."  Renovate, Merriam-Webster Dictionary, https://www.merriam webster.com/dictionary/renovate (last visited March 21, 2023).  The undisputed evidence shows that the HVAC system work involved changing out the aging and malfunctioning units to restore the system and its functioning to a former, better state.

In sum, Dika breached the lease by refusing to reimburse OfficeMax for the lighting and HVAC work it performed under the tenant allowance provision of the agreement.  OfficeMax was therefore entitled to withhold rent equal to the amount owed under section 5, and doing so was not a violation of the lease.

### b. Section 14

OfficeMax contends in the alternative that Dika cannot recover for breach of contract related to OfficeMax's nonpayment of rent because Dika breached section 14 of the lease by failing to reimburse it for the expense it incurred to replace the HVAC system. The Court agrees with OfficeMax that even if it was not entitled to reimbursement for the HVAC work under section 5 (or if there are genuine factual disputes about that precluding summary judgment), its entitlement to reimbursement under section 14 is clear.

Section 14 of the lease states, in relevant part, as follows:

> Landlord represents and warrants that all utility, mechanical, plumbing, and other systems serving the Demised Premises shall be in good operating condition and repair as of the date of occupancy by Tenant, and all HVAC systems shall be new, and *Landlord shall pay for any replacements required for such systems prior to the expiration of the first full calendar year after the Date of Occupancy. If Tenant is required to replace any such systems during the last three (3) years of the term (or extended term, as the case may be) of this lease*, Landlord, within the latter of fifteen (15) days after receiving copies of paid bills therefor or ninety (90) days prior to the expiration of the term of the lease, shall reimburse Tenant for an amount equal to the product obtained by multiplying the cost thereof by a faction equal to (a) one (1) minus (b) a fraction, the numerator of which shall be the number of days subsequent to the date Tenant paid such bills to and including the last day of the term (or extended term, as the case may be) of this lease, and the denominator of which shall be the number of days in the entire "useful life" of such systems.

Def.'s 56.1 SOF, Ex. 1, § 14 (emphasis added).

Dika contends that OfficeMax's expenses for its replacement of the HVAC system did not qualify for reimbursement under section 14 because it did not replace the HVAC system during the last three years of the lease's extended term. Instead, when OfficeMax replaced the HVAC systems, the extended end date of the lease was a

little over four years away.

On August 17, 2021, the Court issued a ruling on Dika's motion to dismiss OfficeMax's counterclaim. In the ruling, the Court concluded that "[b]ecause section 14 expressly provided that OfficeMax had to replace the HVAC system within the last three years of the extended term to be entitled to reimbursement, its replacement of the system fell outside the contractual reimbursement period. It follows that Dika did not breach the lease by refusing to reimburse OfficeMax." Mem. Op. and Order, Aug. 17, 2021, Dkt. no 34. OfficeMax filed a motion for leave to file an amended counterclaim, and a hearing was held on that motion on September 21, 2021. During the hearing, the Court explained that it was construing OfficeMax's motion as a motion for reconsideration of this aspect of Court's August 17 ruling. The Court also explained that it had ruled as just indicated because, in the contractual phrase "[i]f Tenant is required to replace any such systems during the last three (3) years of the term (or extended term, as the case may be) of this lease," the Court read the phrase "during the last three years" as modifying both the word "term" and the phrase "extended term." After considering the arguments OfficeMax presented in its motion regarding the ambiguity of the phrase at issue, the Court noted that there was a possibility it had ruled incorrectly, so it allowed OfficeMax to file an amended counterclaim.

Dika contends that OfficeMax should be bound by the Court's earlier ruling regarding its eligibility for reimbursement under section 14. But upon further consideration, the Court is now persuaded that it erred and that OfficeMax's reading of section 14 is the correct reading. Under a correct reading of the term, section 14 serves as an independent basis for reimbursement of OfficeMax's HVAC replacement

expenses.

The relevant portion of section 14 reads as follows: "If Tenant is required to replace any such systems during the last three (3) years of the term (or extended term, as the case may be) of this lease, Landlord . . . shall reimburse Tenant . . . ." Def.'s 56.1 SOF, Ex. 1, § 14 . The Court previously read the phrase "last three (3) years" as applying both to the original lease term or to an extended lease term. In other words, the Court read it to mean that to be reimbursable, HVAC replacement would have to take place during the last three years of the original term of the lease—i.e., between January 31, 2013 and January 31, 2016—or during the last three years of the extended term—i.e., between January 31, 2018 and January 31, 2021—but not if it took place in the intervening two years. That is, in retrospect, a rather incongruous reading, to say the least. Basic principles of contract interpretation encourage reading contracts with common sense and discourage reading terms in ways that lead to incongruous results like this one. *Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols., LLC*, 8 F.4th 642, 653 (7th Cir. 2021) (contracts should be interpreted with common sense to avoid reaching nonsensical results).

Upon further consideration, the Court concludes its earlier reading of section 14 was wrong. The lack of the preposition "of" before the phrase "the extended term" indicates that "the last three years" modifies only the phrase "of the term," and not "the extended term," contrary to the Court's earlier reading. If the parties intended reimbursement to cover HVAC replacement only if done during the last three years of the extended term, then they would have drafted it to say "during the last three (3) years of term (or of the extended term, as the case may be)," or to say "during the last three

16

(3) years of term (or the last three years of the extended term, as the case may be)."  In sum, section 14, correctly read, entitled OfficeMax to reimbursement for the HVAC replacement work if was done at any point during the lease's extended term—which is when the replacement was done.

Relying almost exclusively on the Court's earlier opinion, which it states is "the law of the case" (Pl.'s Resp. at 2, 3, and 11), Dika makes what is at best a passing effort to refute OfficeMax's textual arguments regarding section 14.  First, the Court's earlier reading of section 14 was an interlocutory ruling that the Court had the inherent power to reconsider at any point before entry of final judgment.  *Marconi Wireless Tel. Co. v. United States*, 320 U.S. 1, 47–48 (1943).  And the Court made it clear shortly after making its initial ruling that it was open to the possibility that the ruling was wrong.[2]

For the reasons described, the Court concludes that section 14 is an independent and alternative basis under which OfficeMax was entitled to be reimbursed for the HVAC work it undertook.  No reasonable factfinder could find otherwise.  Consequently, Dika breached the lease by refusing to honor OfficeMax's request for reimbursement, and OfficeMax therefore did not breach the lease by withholding rent to cover the HVAC expenses.

### c.    Amount withheld

Dika also challenges the amount of rent that OfficeMax withheld, contending that

---

[2] The only other argument made by Dika is its contention that "John Vryonides, the current senior director of real estate and lease administration, testified that Section 14 of the Lease provided that the tenant would be reimbursed for the replacement of air conditioning units if the replacement occurred during the last 3 years of any extended term."  Pl.'s Resp. at 3.  That is not accurate.  Vryonides testified to just the opposite on both direct and cross examination.  Vryonides Dep. at 50:4-53:14, 86:20–88:17.

it exceeded what was allowed under section 29 of the lease.  It is true that section 29 states that, if Dika defaulted on its lease obligations, OfficeMax could withhold only up to 25 percent of the monthly rent.  But the terms of section 5—which is an independent basis for reimbursement—plainly state that Dika's failure to pay "*any portion* of the Tenant Allowance" entitled OfficeMax to "deduct *such amount* from Annual Minimum Rent."  Def.'s 56.1 SOF, Ex. 2, § 5 (emphasis added).  The "conflict" provision of the second amendment states that any conflict between the second amendment and the original lease is to be resolved in favor of the second amendment.  *Id.* § 10 ("**Conflict**. In the event of any conflict between the Lease and this Second Amendment, *the terms and provisions of this Second Amendment shall govern*.").  In other words, OfficeMax's withholding rights under section 5 of the second amendment trump its withholding rights under section 29 of the original lease.  Dika contends, rather confusingly to say the least, that section 10 demands the opposite result: "S-10 of the Second Amendment requires use of S-29 of the Lease for rent deduction limits."  That's not a reasonable reading of the conflict provision.

Because the Court has determined that section 5 entitled OfficeMax to reimbursement and thus to rent withholding when Dika failed to provide reimbursement—the Court concludes that OfficeMax was within its right to deduct from the annual minimum rent the amount owed under the tenant allowance provision.[3]

Finally, Dika lodges a hodgepodge of objections to the evidence presented by OfficeMax to verify its expenses.  The Court overrules those objections, as most if not

---

[3] The Court also notes that although that provision allows for up to $75,000 in reimbursement, OfficeMax only sought reimbursement for its actual expenses, which came in under $75,000.

18

all of them are bald assertions unsupported by any evidence, caselaw, or developed argument. *See Betco Corp. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (arguments that are underdeveloped or conclusory are forfeited). There is simply no *genuine* dispute of fact on this question; no reasonable juror could conclude that OfficeMax did not incur the expenses for which it sought reimbursement.

### 2. Failure to pay CAM fees and real estate taxes

Dika contends that OfficeMax's alleged failure to pay its share of common area maintenance (CAM) fees and real estate taxes under section 4 of the lease constitutes further grounds for its breach of contract claim. OfficeMax contends that Dika cannot recover for those breaches—which it disputes even occurred—because Dika did not give OfficeMax notice or an opportunity to cure as required by section 23 of the lease. Rather, OfficeMax contends, Dika raised these issues for the first time in its complaint in the present lawsuit. OfficeMax further contends that, in any event, all outstanding CAM fees and real estate taxes have been paid. The Court agrees with OfficeMax that there is no genuine factual dispute regarding this aspect of count 1.

First, OfficeMax is correct that section 23 of the lease required Dika to give OfficeMax written notice of any default, and an opportunity to cure, prior to filing suit. Section 23 states that "if any default by [OfficeMax] (except nonpayment of rent) cannot reasonably be remedied with thirty (30) days after written notice of such default, then [OfficeMax] shall have such additional time as shall be reasonably necessary to remedy such default before . . . [Dika] may enforce any remedy permitted herein or at law." Def.'s LR 56.1 SOF, Ex. 1, § 23. Dika reads the words "or any other action of a monetary nature" into the parenthetical "(except nonpayment of rent)" to argue that

notice and opportunity was not required before filing suit for the allegedly unpaid CAM fees and real estate taxes. But those words are nowhere in section 23. *Delta Min. Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1405 (7th. Cir. 1994) (holding that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded). Section 23 unambiguously requires pre-suit notice and opportunity to cure for *any* default, with a narrow exception for unpaid rent. There is no basis to expand this exception as Dika proposes.

Dika further contends that, even if notice was required, it complied with that requirement. Dika states in its response and cross-motion, and again in its response to OfficeMax's Local Rule 56.1 statement, that "[i]n each of the three notices that counsel for D-H sent to OfficeMax, D-H demanded that the monthly rent and all other charges must be paid. (Amended Complaint, Dkt. #8, 60-69)." Pl.'s Resp. to Def.'s LR 56.1 SOF, ¶ 34. That is false. As previously stated, the "notice" letters sent by to Dika to OfficeMax contained no mention of OfficeMax's failure to pay real estate taxes or CAM fees. Rather, Dika cited only a violation of section 15 of the lease—OfficeMax's obligation to seek approval prior to making changes to the property—as the source of OfficeMax's default.

The Court also agrees with OfficeMax that Dika's claims would fail even if it had performed its contractual obligation to give OfficeMax notice and an opportunity to cure. OfficeMax has provided undisputed evidence that it has satisfied its debts on these two categories of expenses. Dika's own response to OfficeMax's interrogatory number five also indicates that OfficeMax made the real estate tax payments that Dika claims were due, albeit belatedly. Indeed, the singular mention of CAM expenses and real estate

taxes in Dika's response and cross motion is the following:

> We note that OM has proposed that as D-H has asserted a claim for recovery of CAM and taxes which D-H asserted were not paid, or was deducted by OM, as that claim is not true the D-H claims should fail in their entirety. No facts or law to support that type of determination was identified by OM. The failure to support a claim with facts or law prevents enforcement of that claim. The failure to support a claim with facts or law does not negate or prevent enforcement of any other claims that are presented or proved. There is no basis under the law for the assertion that OM should not be liable for all of the rent it did not pay *because it paid other obligations*. There is no basis under the law for the assertion that OM should not be liable for the rent withheld or OM's deduction and nonpayment of $75,000, or any other amount of rent that OM did not pay.

Pl.'s Resp. at 12 (emphasis added). Dika misunderstands OfficeMax's contentions, but more importantly, Dika seems to concede (in the italicized portion of the quoted material) that OfficeMax *did* pay the real estate taxes and CAM fees it was required to. The Court also notes that the prayer for relief section in Dika's response to the motion for summary judgment omits any mention of the CAM expenses.

For these reasons, the Court concludes that OfficeMax is entitled to summary judgment on Dika's breach of contract claim to the extent it concerns the claimed failure to pay real estate taxes and CAM fees.

### 3. Failure to leave the premises in good condition

Dika's final basis for its breach of contract claim is that OfficeMax failed to leave the property in good order or condition as required by section 14 of the lease. In Dika's complaint, it did not allege facts that would support an inference that OfficeMax failed to leave the property in good order or condition. Rather, Dika stated only that "[it] is not known if any repairs will be necessary to return the subject property to good order and condition." Am. Compl. ¶ 8.

During written discovery, Dika for the first time stated, in slightly more detail, how

it believes OfficeMax left the property in a state that required a number of repairs. Dickler (Dika's corporate representative and also one of its counsel of record) then conducted a Google search for the average cost of repairs of the type involved—collectively, over $400,000—and now asserts that those costs should be paid by OfficeMax. (It should go without saying that that's a woefully deficient basis for any contention that Dika was damaged by the claimed breach. But during his Rule 30(b)(6) deposition, Dickler testified that Dika did not know whether some of the asserted repairs were necessary, and he could not identify what injury resulted to Dika from them. Moreover, the photos of the property offered by Dika that supposedly support its claim for damages were taken over a year after OfficeMax vacated the premises. And Dika offers no foundational evidence comparing these belated photos with the actual condition of the property when OfficeMax first took possession of it almost twenty years earlier. *Republic Bank of Chicago v. Desmond*, 579 B.R. 466, 485 (N.D. Ill. 2016) (holding that a lessor failed to establish breach where no evidence was introduced showing that alleged damage to the property was not present when the lessee assumed possession of the property). Section 14 required OfficeMax to maintain the premises in good condition only "[t]hroughout the term" of the lease. Def.'s LR 56.1 SOF, Ex. 1, § 14. Thus, without evidence to establish that the alleged damage occurred during OfficeMax's tenancy—and not before or after it—no reasonable juror could find that OfficeMax breached this provision of the lease.

In sum, both Dika's complaint and its response to OfficeMax's motion for summary judgment are deficient with respect to this aspect of its breach of contract claim. At the outset of the case, Dika made no real effort to state a claim for breach of

the lease on this basis. Now, in the summary judgment phase of the case, Dika still has not adequately developed an argument, let alone evidence regarding the need for repairs or their cost. The scanty evidence Dika has offered would not permit any reasonable factfinder to find in its favor on the repair allegations. The Court concludes that Dika has forfeited any ability to forestall summary judgment on this basis.

For the foregoing reasons, the Court grants summary judgment in favor of OfficeMax on count 1 of Dika's complaint.

**B.    Count 2: fraud**

In count 2, Dika alleges that OfficeMax wrongfully withheld rent after it was denied reimbursement for its replacement of the HVAC system and lighting system. Specifically, Dika contends in count 2 that OfficeMax withheld rent despite having full knowledge of the fact that it was not entitled to reimbursement under either section 5 or section 14 of the lease. Dika further contends that, because OfficeMax did not seek Dika's consent prior to undertaking the HVAC and lighting replacements, and because it knew it was not entitled to reimbursement for that work, OfficeMax's nonpayment of rent was an attempt to defraud Dika.

This claim is premised on the proposition that OfficeMax was not entitled to reimbursement for its expenses related to the HVAC and lighting replacement, which was the core of the dispute over count 1. This is underscored by the fact that neither party separately addresses count 2 in their briefs. The Court has concluded that OfficeMax *was* entitled to reimbursement under the terms of the lease, and that Dika's denial of that reimbursement constituted a breach of the lease that entitled OfficeMax to withhold rent. It follows that Dika's fraud claim fails.

23

For these reasons, the Court grants summary judgment in favor of OfficeMax on count 2.

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [dkt. no. 103] but denies plaintiff's cross motion [dkt. no. 105]. All that remains in the case are OfficeMax's three counterclaims, as neither party moved for summary judgment on those claims. It may be that the counterclaims, which appear to amount to the converse of Dika's breach of contract claim, are effectively moot in light of the Court's grant of summary judgment in favor of OfficeMax on that claim. The parties are directed to promptly confer on this point and are to file by March 28, 2023 a *joint* status report of no more than eight pages stating their positions on this and explaining any position that further litigation is required on the counterclaims. A telephonic status hearing is set for April 6, 2023 at 9:00 a.m. The following call-in number will be used: 888-684-8852, access code 746-1053.

Date: March 21, 2023

_____
MATTHEW F. KENNELLY
United States District Judge